'O’Neall, J.
delivered the opinion of the Court.
In this case, I don’t propose to pass over the grounds in; the order set down in the notice of appeal. The objections are of law and fact. I will first dispose of the facts,, and then take up the legal objections, disposing first of the 7th ground, and then of the legal question covered by the-first six grounds.
Before I proceed to the task before me, 1 trust I may be-allowed to say, 'that in this case,, from the beginning, 1 have brought to it all the powers which I possess — so that justice, impartial, even handed justice, should be done between a corporation and a citizen. If in any matter I am or have been in error, I confess, after all the argument and examination, I am unable to perceive it. 1st. It is enough, as to the facts, to say, that they went to the jury under the rule of law contended for by the plaintiff; that the burden of proof, to exempt himself from the liability cast upon him by his receipt, was on the defendant. The jury have said, we are satisfied the defendant never received the money, and in that conclusion I fully concur. It is impossible to put upon paper the many little matters which lead to that opinion. The principal facts are, that the defendant received the packages without counting ; that they were all sealed up; one of them was under the seal of the late venerable and excellent President of the Bank.. Some of those packages appeared to be bunglingly put up, and some of them looked like they had been re-sealed, yet some ot these were found to be right; they were annually counted as so much money. On one occasion, the President pointed out his seal as a reason why there was no necessity to count. The defendant’s character was not only good, but above suspicion; he showed how he acquired the largo sums of money which he paid away, and indeed, accounted for his monetary affairs in a way which few men could do. The circulation of the Bank was a very limited one, during his term as Cashier, never reaching $100,000; the bills embezzled or stolen, in whole or in part, were old bills which were never intended to bo again put in circulation ; if they were put in circulation, it is *404 difficult to conceive that they could not have been discovered and the fraud or larceny early detected ; so too, the circulation of the Bank was not only limited in amount but also in time. A package of bills, $10,000 loaned and marked by the President, were all redeemed at the counter in less than two weeks. These facts thus thrown together, make out enough to satisfy most minds, that the defendant never had the money ; and here it may be remarked, that it is not necessary in this Court to demonstrate that the jury have decided the facts right, it is enough if it be not shown that they are palpably wrong. The only suspicious circumstance, is that the defendant, as a private dealer with the Bank, over-drew his deposits from January, 1843, to August, 1845. This, although the result of great, carelessness, was not the result of design, as the jury have found, and as I believe. For this matter, as.one of the evidences of the defendant’s guilt, was pressed upon the jury ; notwithstanding it, they have found for him, and hence the conclusion that they did not think it intentional. For if they had found it to be intentional, it would have shown him to befalsus in uno, and thence falsus in omnibus. This would have been a very ‘pertinent conclusion. Bat I have indorsed the conclusion of the jury, and said, that I also do not believe there was any intentional over-draft.— The books of the Bank were badly kept. The book-keeper from ’39 to ’45, Mr. Alexander, said, that previous to ’39, the books had never been balanced. He attempted it, but in his books there were such errors of addition and subtraction, that nothing certain could be obtained. From his books, when Sollee went out of office, there appeared no over-draft. Another person was employed to go over his books, and then to his astonishment, and that oí Sollee, it was found he had over-drawn. It is very true, the defendant ought to have kept his own Bank book. He was a very large depositor ; for his own security, he ought to have kept the account. But he might have thought it was wholly unnecessary; the Bank books could be referred'to daily, and the situation of his account ascertained. Finding the error leading to the over-drafts in the Bank itself, *405 it negatives the fraudulent intention on the part of the defendant. But it is said, the Judge misled the jury in saying to them, that it seemed to him to be clear, that if $20,-400 had been purloined between ’37 and ’42, they (the Bank) had not been called on to pay a dollar of it. It' is enough, and it is all I intend to say for the Court, that if there be error here, it was merely on a fact about which the jury, and not this Court, were to judge. Such an error has never been held to be a ground for new trial. But for myself, I may be allowed to vindicate the instruction, and show, even against the admission of one of the defendant’s learned counsel, that there was even here no error. It has been assumed, that of the bills issued by the Bank, there must have been at least $20,000 lost by wear and tear and accidents, in 35 years. That I deny. In 20 years, Mr. Ravenel, the intelligent President of theFlanters’ and Mechanic’s Bank, stated the largest loss to be on the $5 bills, as we would naturally expect from .their greater circulation. It was, he said, $1 40-100 in the hundred. The loss on $20 bills was, he said, 32-100 in the hundred, in the same time.
The circulation of the Union Bank, from its commencement in 1810, to 1820, only at three times exceeded $600,-000, it never reached $700,000. It began at $615,000, and was oftener below than above $500,000. For the ten years, I assume that sum as the average circulation — it is greatly above the truth. If every bill issued by the Union Bank had been of $5, and its circulation as extensive as that of the Planters’ and Mechanics’ Bank, the loss in ten years would have been $3,750; but its circulation could not have been more than one-fourth of the whole in $5 bills, the rest was in $10-20-50 — 100. The result would be, I have no doubt, nigher the truth, to put down the loss from the largest portion of the circulation, being in larger bills, at about one-half of what it would have been if 5s had been the whole circulation, say 1,875. From ’20 to ’37 — 17 years — the circulation never much exceeded 200,000, and when it did, only for a very short time. It was often below it, and very much below it. Taking that as the aver *406 age circulation, and ascertaining the loss .in the same manner in which it was done for the first ten years, and it amounts to 1,500. From ’37 to ’45/ the circulation never exceeded 100,000; it often was much below it. The loss in that time, could not exceed 750; add the losses for the three periods, it makes the aggregate 4,125. Strike off from this, one-third for over-estimates of circulation, and the narrower sphere in which the Union Bank bills circulated, and it will bring down the loss lo 2,740; within less than 200 of the sum to which Mr. Godard reduced the circulation in 1842. . Now, unless there be something strangely mysterious in Banking, or some error in the data on which I have, based my calculation, it is plain, that if the money was stolen, the thief still has it locked up. For, as Aaron C. Smith said, the Bank has never been called on to pay more bills than she knew she had in circulation. Now, if ■we could believe, that from the beginning these packages were fraudulent, the whole mystery would be removed, by showing, as the calculation would do, that in fact, they never had the sum, now alleged to be stolen, in circulation. But the defendant is only responsible for the period from. ’37 to ’45. In that time, the circulation never exceeded 100,000, and indeed its average would not be 50,000.— Throw out 20,000 additional and surruptitiously — would not the Bank have soon found that she had out more money than she knew? So much for this part of the case’, it maybe that, like me, the jury thought this was the true view, and if they did, how can this Court say, they or I were or was in error.
2d. The 7th ground insists, that the plaintiff should have-had a verdict on the over-drafts with interest from the time they respectively occurred, and not, as I ruled, from the time he went out of office, or from a demand, if one had been made, earlier. There is no doubt,.if the action was for money had and received against Mr. Sollee, as an individual, and not as Cashier, that then the Bank would be-right in their demand, and that he must allow interest from, the day of each over-draft. But the action is for an official default. Most of my brethren, think, if I erred, that; *407 the error was in allowing the Bank to recover at all for the over-drafts on the official bond. They think that his official duty terminated when he handed the money to the Teller, and that the Teller is answerable officially for the over-drafts. Be this, however, as it may, it is perfectly clear, that the only official default chargeable to the defendant in reference to the over-drafts, is, that he did not turn over that much money which might then be regarded as in his hands. As Cashier, he is not liable to interest; his duty is to keep the money. When he went out and failed to pay, then, and not before, (as there was no previous demand,) the right to interest accrued.
3d. The six first grounds maintain, that the- defendant,, by his receipt of the 27th September, 1837, discharged his predecessor, Wilkie, from his liability to the Bank, and that therefore, and thereby, he was concluded from denying that he had then in his hands the 20,400, found to be wanting on the count 21st July, 1845.
I have no doubt about the rule stated by Prof. Green-leaf, in his vol. on Evidence, page 240, s. 207. “Admissions which have been acted upon by others are conclusive,, against the party making them, in' all cases between- him- and the person whose conduct he has thus influenced.”" Receipts are to be considered as admissions! The case of Wyatt v. The Marquis of Hertford, 3rd East, 147, is a¿ very perfect illustration of the rule. The plaintiff had done work for the defendant; his account was presented to the defendant’s Steward, who gave him his own draft on a banker; the plaintiff gave him a receipt for so much money, on the account of the defendant. The banker refused to pay the draft; the plaintiff returned it to the Steward, who gave him another payable twenty days after. No information about these occurrences were given to the defendant. The second draft was not paid, and the Steward being insolvent, the plaintiff sued the defendant, who relied on the plaintiff’s receipt as his discharge, inasmuch as his Steward had sufficient funds of the defendant’s to have paid the plaintiff, and had gone away much in arrear to him. It did not appear that the defendant had settled with *408 his Steward and passed this receipt to his credit. Lord EUenborough, on the circuit, thought the defendant was discharged, and a verdict was found accordingly. But on the motion for a new trial, he placed the case on the proper ground. ' He said “ there must be a new trial; for on revising his note of the evidence, it did not appear that the defendant was in any way prejudiced, by his Steward having given his own security and taken the latter’s receipt. That if it appeared, that the defendant had in the interval inspected the Steward's accounts, and had in any manner dealt toith him differently on the supposition that this demand had been, satisfied, as the receipt imported, no doubt the defendant would have been discharged, for it was clear, that Hunt had sufficient money of the defendant's in his hands to answer the demand." The rule, as. stated by Greenleaf and illustrated by this case is good-law ; under it, let it be assumed, that the defendant gave his receipt to Wilkie, (which however, is not the true view, as will be hereafter shown,) and then the question will be, has the Bank acted on it, and discharged Wilkie? It is-clear they have not, for when the turning over of the assets of the Bank to the defendant, and the fact that he had given a receipt for them, was reported to the Bank, it was received as information merely: no order accepting and confirming the report, or to discharge Wilkie, was then, or afterwards, made. Even his bond, from any thing which appears, may now be in the possession of the Bank. There is nothing therefore done by the Bank, in consequence of Sollee’s receipt, which if it had not been given, they would not have done. But it is useless tO' pursue a supposed case, and leave that which is before us. Sollee, as Cashier, did not receive the money and other assets of the Bank from Wilkie’s representative.— The Committee of the Bank tell us, what was done in the document before us. They say that “they proceeded toan examination of the vault in the presence of Mr. C. J. Steed-man, a friend of the late Cashier; examined and counted the specie, bills and notes, certificates of stock and ¡bonds, in the possession of the deceased, and found the whole as *409 follows This shows, that, they made the count: it was that which discharged Wilkie,: if any thing did, the funds being found right. They were in the Bank’s own vault, and the 'Committee, not Mr. Wilkie’s representative, turned them over to the defendant. They say further, in their report '“the whole was delivered over to Mr. Henry Sollee, who acknowledges the same.” This report was signed by the Committee, and also by the defendant. This was in fact and in law, an admission to the Bank; “I have to-day from your counting Committee, received the funds of the Bank, as appears by their statement.” Considered in that way, there is no doubt it is examinable, and if erroneous the defendant is not bound by it. It is true, however, in sue h an examination, the onus of showing the error is entirely on him ; if he fails to make it out satisfactorily to the court and jury, he must abide by his receipt and admission. So the'jury were charged, and it is now in vain to say they might have thought the plaintiff was bound to satisfy them, that the defendant had the money. No' such issue was submitted to the jury ! They felt the responsibility devolved upon them; they knew well that unless the facts satisfied them, that the defendant never had the money, they must charge him under the receipt with it. It is very true that the defendant made up weekly reports, of which this receipt was the predicate, but if it were wrong, they1 were also wrong. They, no more than their parent, led the Bank estray ; the error began with the Bank, and they had constantly the means of correcting it. They counted annually, yet they always counted by the package, and if they had gone on, in that way, to the end of time, the error never would have been detected.
But it is said, that neiLher the Directors nor the Committee are the Bank. This is true, but they, as well as the defendant, were agen Is of the Bank. They were the defendant’s superiors; they had the right to. direct-his conduct in every thing, not inconsistent with the by-laws, rules, and regulations of the Bank. If it had been peculiarly the defendant’s duty to settle with 'Wilkie, then indeed, perhaps, the act of the Committee would be his, and he would *410 be obliged to answer for it, but I am not aware of any such duty. The Bank could, and did, by their Directors, send down a Committee to make the settlement. The defendant, in no view of this transaction, can be concluded from examining the correctness of the receipt.

The motion is dismissed.

Richardson, J. Evans, J. and Withers, J. concurred.
Wardlaw, J. and Frost, J. concurred in the law as stated, and in refusing a new trial upon a question of fact.